# UNITED STATES DISTRICT COURT
### for the
### Western District of North Carolina

|  |  |  |
|---|---|---|
| *Plaintiff* | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant* | | |

## SUMMONS IN A CIVIL ACTION

**TO:** *(Defendant's name and address)*

    **A lawsuit has been filed against you.**

    **Within 21 days after service of this summons on you (not counting the day you received it) – or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12(a)(2) or (3) – you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:**

    **If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.**

**Civil Action No.**

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4(1))*

**This summon for** *(name of individual and title, if any)*
_____

**was received by me on** *(date)* _____ .

❑     **I personally served the summons on the defendant at**
       *(place)*_____
       **on** *(date)* _____ ; or

❑     **I left the summons at the individual's residence or usual place of abode with** *(name)*
       _____ **, a person of suitable age and discretion who**
       **resides there, on** *(date)* _____ **, and mailed a copy to the individual's last**
       **known address; or**

❑     **I served the summons on** *(name of individual)* _____ **,**
       **who is designated by law to accept service of process on behalf of** *(name of organization)*
       _____ **on** *(date)* _____ ; or

❑     **I returned the summons unexecuted because** _____ ; or

❑     **Other** *(specify)*:
       _____

**My fees are $** _____ **for travel and $** _____ **for services, for a total of**
**$_____ .**

**I declare under penalty of perjury that this information is true.**

**Date:**_____        _____
                                                 **Server's signature**

                                                 _____
                                                 **Printed name and title**

                                                 _____
                                                 **Server's address**

**Additional information regarding attempted service, etc:**

## UNITED STATES DISTRICT COURT
### for the
### Western District of North Carolina

| | | |
|---|---|---|
| *Plaintiff* | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant* | | |

### SUMMONS IN A CIVIL ACTION

**TO:** *(Defendant's name and address)*

      **A lawsuit has been filed against you.**

      Within 21 days after service of this summons on you (not counting the day you received it) – or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12(a)(2) or (3) – you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

      If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

**Civil Action No.**

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4(1))*

**This summon for** *(name of individual and title, if any)*
_____

**was received by me on** *(date)* _____.

❏      **I personally served the summons on the defendant at**
       *(place)*_____
       **on** *(date)* _____; **or**

❏      **I left the summons at the individual's residence or usual place of abode with** *(name)*
       _____, **a person of suitable age and discretion who**
       **resides there, on** *(date)* _____, **and mailed a copy to the individual's last**
       **known address; or**

❏      **I served the summons on** *(name of individual)* _____,
       **who is designated by law to accept service of process on behalf of** *(name of organization)*
       _____ **on** *(date)* _____; **or**

❏      **I returned the summons unexecuted because** _____; **or**

❏      **Other** *(specify)***:**
       _____

**My fees are $** _____ **for travel and $** _____ **for services, for a total of**
**$_____.**

**I declare under penalty of perjury that this information is true.**

**Date:_____**          _____
                                                                        **Server's signature**

                                                    _____
                                                                        **Printed name and title**

                                                    _____
                                                                        **Server's address**

**Additional information regarding attempted service, etc:**

# UNITED STATES DISTRICT COURT
## for the
### Western District of North Carolina

| | | |
|---|---|---|
| *Plaintiff* | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant* | | |

## SUMMONS IN A CIVIL ACTION

**TO:** *(Defendant's name and address)*

 

**A lawsuit has been filed against you.**

**Within 21 days after service of this summons on you (not counting the day you received it) – or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12(a)(2) or (3) – you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:**

 

**If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.**

**Civil Action No.**

# PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4(1))*

**This summon for** *(name of individual and title, if any)*
_____

**was received by me on** *(date)* _____.

❏     **I personally served the summons on the defendant at**
    *(place)*_____
    **on** *(date)* _____; **or**

❏     **I left the summons at the individual's residence or usual place of abode with** *(name)*
    _____**, a person of suitable age and discretion who**
    **resides there, on** *(date)* _____**, and mailed a copy to the individual's last**
    **known address; or**

❏     **I served the summons on** *(name of individual)* _____,
    **who is designated by law to accept service of process on behalf of** *(name of organization)*
    _____ **on** *(date)* _____; **or**

❏     **I returned the summons unexecuted because** _____; **or**

❏     **Other** *(specify)***:**
    _____

**My fees are $** _____ **for travel and $** _____ **for services, for a total of**
**$**_____.

**I declare under penalty of perjury that this information is true.**


**Date:**_____          _____
                                                  **Server's signature**


                                      _____
                                              **Printed name and title**


                                        _____
                                              **Server's address**


**Additional information regarding attempted service, etc:**

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| Shannon Staton, administrator of the Estate of Pauline Marie Crestani a/k/a Paula Stork, | ) ) ) ) | Civ. No. _____ |
| Plaintiff, | ) ) | **COMPLAINT** (Jury Trial Demanded) |
| v. | ) ) ) | |
| Rajat Kumar, MD; Novant Health Medical Group, LLC; Novant Health, Inc., | ) ) ) | |
| Defendants. | ) ) ) | |

NOW COMES the Plaintiff, Shannon Staton, administrator of the Estate of Pauline Marie Crestani a/k/a Paula Stork ("Ms. Stork"), through her undersigned attorneys, complaining of the Defendants, Rajat Kumar, MD; Novant Health Medical Group, LLC; and Novant Health, Inc., alleging and saying as follows:

**PARTIES**

1.      Plaintiff Shannon Staton is, and at all times relevant to this action was, a citizen and resident of Florida. She is the daughter of, and the administrator and sole beneficiary of the estate of, Pauline Marie Crestani a/k/a Paula Stork.

2.      Defendant Rajat Kumar, MD, is a thoracic surgeon employed by Novant Health Medical Group, LLC, and affiliated with Novant Health Presbyterian Medical Center in Charlotte, North Carolina. Upon information and belief, he is a citizen of North Carolina and a resident of Mecklenburg County.

3.      Defendant Novant Health Medical Group, LLC, is a limited liability company organized under the laws of North Carolina, with its principal office at 2085 Frontis Plaza

Boulevard, Winston-Salem, North Carolina.  On information and belief, all members of Novant Health Medical Group are citizens of North Carolina.

4.     On information and belief, at all times relevant to this action, Dr. Kumar was an employee and/or agent of Novant Health Medical Group, which is liable for his actions pursuant to the doctrine of respondeat superior and/or the law of agency.  All alleged conduct of Dr. Kumar was performed in his role as an agent of Novant Health Medical Group or in the course and scope of his employment with Novant Health Medical Group.

5.     Defendant Novant Health, Inc., (the "Hospital") is a non-profit corporation incorporated under the laws of North Carolina with its principal office at 2085 Frontis Plaza Boulevard, Winston-Salem, North Carolina and doing business as Novant Health Presbyterian Medical Center in Charlotte, North Carolina.

6.     At all times relevant to this action, Dr. Kumar was an apparent agent of the Hospital, which is liable for his actions under the law of agency.  The Hospital held itself out as providing medical services through Dr. Kumar as its agent practicing under the same name as the Hospital and his employer ("Novant Health"); Ms. Stork looked to the Hospital rather than to Dr. Kumar to perform those medical services; and she accepted those services in the reasonable belief that they were being rendered by the Hospital or by the Hospital's employees.  Dr. Kumar has admitting privileges only at the Hospital and he lists "Novant Health" as his employer on his own LinkedIn page.

## JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and is between citizens of different states.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the most substantial part of the events giving rise to the claim occurred in the Western District of North Carolina.

9. The Charlotte Division is the proper division because the most substantial part of the events giving rise to the claim occurred in the Charlotte Division.

## FACTS

10. Ms. Stork was a former smoker. She received periodic low-dose screening computed tomography (CT) scans to ensure she was cancer-free. On June 13, 2023, a scan showed an increase in size of a ground-glass opacity lesion in her upper right lung, a term for a hazy, gray area on the CT scan signifying increased tissue density.

11. Because the lesion grew, a biopsy was recommended. Dr. Kumar performed the biopsy on October 30, 2024. A bronchoscopy was performed on that date a well, which confirmed a normal trachea.

12. The biopsy confirmed the lesion to be stage 1A2 (cT1bN0) adenocarcinoma. An adenocarcinoma is a cancer of mucus-producing glandular cells. Ms. Stork's cancer was an early-stage, slow-growing non-small cell lung cancer that had not spread to lymph nodes or metastasized to other parts of her body and had not invaded main airways of her lung. The five-year survival rate for treated cancers of this type and stage is 80% to 85%.

13. A lobectomy, the standard treatment for such an adenocarcinoma, was recommended.

14. Dr. Kumar performed the lobectomy with a mediastinal lymph node dissection on December 13, 2024. Mediastinal lymph node dissection is standard practice in surgical treatment of non-small cell lung cancer to determine and to prevent the spread of the cancer.

15. Ms. Stork immediately began to suffer from a buildup of chylous, a milky lymphatic fluid, in her chest (chylothorax). Chylothorax is a symptom of damage to the lymphatic system, which in Ms. Stork's case would have to have been caused by the surgery, given the timing and location of its onset.

16. On December 17, 2024, Dr. Kumar informed Ms. Stork and her family that he believed he "nicked her lymphatic system and needs to do a procedure to seal it." The procedure proposed appears to be a thoracic duct embolization, which treats chylothorax by using a catheter in a lymphatic vessel to seal the leak.

17. On December 19, 2024, a lymphangiogram confirmed a right lymphatic leak from a branch of the thoracic duct. The thoracic duct embolization was attempted but was unsuccessful because the "leak appears to be paratracheal space" meaning the area lateral to the trachea where the paratracheal level 4 lymph node dissected during the lobectomy was located. The catheter could not be successfully passed to that level. Dr. Kumar told Ms. Stork and her family that he needed "to go back in for a second surgery to seal the hole in the lymphatic system."

18. On December 20, 2024, another procedure was performed, partial decortication and pleurodesis, which is a surgical intervention to treat persistent pleural effusions. The procedure performed on Ms. Stork involved blunt dissections and dissections with bipolar cautery of the right paratracheal space. A bronchoscopy was performed before the surgery, which confirmed a normal trachea.

19. Immediately after the surgery, Ms. Stork developed a terrible cough and considerable trouble breathing. Nevertheless, she was discharged on December 24, 2024.

20. On January 6, 2025, Ms. Stork had a follow-up appointment with Dr. Kumar. She complained about a severe cough, chest pain, and difficulty breathing. Dr. Kumar's office visit

notes falsely state that she "denies any complaints" of "chest pain, shortness of breath, [or] dyspnea with exertion." In truth, Ms. Stork presented and complained about a severe, productive cough with an abnormally wet sound.

21. On January 21, 2025, Ms. Stork had a chest x-ray as required before her next follow-up appointment with Dr. Kumar on January 23, 2025. The radiologist noted "increasing prominence of the superior right mediastinum" [the portion of the chest cavity containing the trachea], which can be indicative of a tracheamediastinal fistula. He recommended a contrast-enhanced CT scan, which is the standard follow-up to determine the cause.

22. On January 23, 2025, Ms. Stork met with Dr. Kumar. Her cough and shortness of breath were even worse. Dr. Kumar declined to order a CT scan, and instead he said he would monitor the issue for two weeks. Ms. Stork returned home and spoke with her daughter, who told her she should insist on the CT scan. Ms. Stork called Dr. Kumar, and a CT scan was scheduled.

23. The CT scan was performed on January 25, 2025. Per the reading physician, Dr. William McGarry, the result of the CT scan "is a focal loculated pleural-based fluid collection measuring 70 x 28 mm in the paramediastinal right upper thorax, likely a recurrent loculated chylothorax. This is contiguous with nodular heterogeneous density measuring 32 x 21 mm in the subcarinal region which probably relates to the thoracic duct and the chylothorax."

24. On January 27, 2025, at 9 a.m., Dr. Kumar spoke with Dr. McGarry about the CT scan results, and at 9:04 a.m., Dr. McGarry entered an addendum to the results stating, the fluid collection "may also merely relate to focal loculated/postoperative pleural fluid rather than recurrent chylothorax as originally suggested" and "[t]he density in the subcarinal region may relate to postsurgical packing material."

25. Dr. Kumar reviewed the CT scan during an office visit that day, telling Ms. Stork that what was seen in the CT scan was nothing of concern, just as he thought on January 23, and was just the packing he put in during the second surgery on December 20. Dr. Kumar never mentioned fluid collection or any possible procedure to drain it.

26. The next day, Ms. Stork called Dr. Kumar's office and spoke to him. She complained of severe coughing and trouble breathing. Dr. Kumar said to wait a few weeks and that he would order an x-ray if the cough did not get better.

27. Ms. Stork's cough and difficulty breathing continued to worsen, and on January 30, 2025, she checked herself into the emergency department at Novant Health Huntersville Medical Center for shortness of breath. Nursing notes from her visit indicate that she coughed the entire time she was there. At this point Ms. Stork was unable to sleep because of the coughing. Ms. Stork was told that she has fluid in her plural space that needed to be drained. The emergency room physician told her that she would be transported to Presbyterian Hospital for the procedure to drain the fluid. Ms. Stork elected to go home and to call into the Hospital the next day to schedule the drainage procedure, rather than stay overnight in the hospital awaiting transfer.

28. The next day, Ms. Stork called Dr. Kumar to tell him about her emergency room visit and that the physician there said fluid needed to be drained from lung as soon as possible. Dr. Kumar scheduled a CT guided pleural effusion for February 12, 2025, two weeks after the emergency room visit.

29. Finally, on February 12, 2025, fluid was drained from Ms. Stork's plural space by needle aspiration. CT scans obtained for procedure planning purposes determined the area to be drained was partially gas-filled. That finding was discussed with Dr. Kumar prior to the needle aspiration.

30. Sixteen milliliters of opaque, pale white-yellow fluid were aspirated. This was chyle from the chylothorax Dr. Kumar had denied was present.

31. The next day, February 13, 2025, Dr. Kumar asked Ms. Stork to check into the Hospital emergency department. Medical records state he did so because the CT scan guiding the effusion on the previous day found increased gas and fluid collection in the right paratracheal and subcarinal regions as compared to the January 25, 2025, CT scan. However, Dr. Kumar told Ms. Stork and her daughter that the CT scan showed a "dark blob" next to her windpipe which he thought was an infection, that she would be given an antibiotic, and that if the blob decreased in size on the next CT scan that would mean the infection was responding to the antibiotic and she could go home in a few days. Ms. Stork did indeed have an infection, as suggested by the fluid removed during the aspiration procedure and confirmed when it was cultured, but that that was not the "dark blob" next to her windpipe. The "dark blob" was air.

32. Ms. Stork was admitted to the Hospital and on February 14, 2025, and a chest tube was placed.

33. On February 14, 2025, Ms. Stork asked to be sent to Duke University Medical Center for a second opinion. Dr. Kumar advocated instead for a transfer to the University of North Carolina Medical Center (UNC), because he did not "know anyone" at Duke. Dr. Kumar did his surgical residency at UNC.

34. Dr. Kumar then inserted a long note into an attestation of a physician assistant's clinical note, stating that Ms. Stork had an unproductive cough until that week and that she might require transfer if a tracheal stent is needed as that procedure is unavailable at the Hospital.

35. On February 15, 2025, a Hospital internist assessed Ms. Stork with a tracheal fistula and chylothorax infected with strep, based on sample culture results.

36. Another CT scan was performed on February 17, 2025, which noted direct fistulous communication between the right upper lung gas field and her trachea.

37. On February 17, 2025, Ms. Stork's daughter was told that Ms. Stork was waiting for a bed to open at Duke. Actually, Duke was waiting on an attending physician at the Hospital to have a call with the accepting Duke provider, a necessary step for Duke to accept the transfer patient. At 6:45 p.m., Duke was still waiting for the attending physician to have a call with the accepting provider at Duke, a necessary step for transfer.

38. On February 18, 2025, at 7:30 p.m., Duke notified the Hospital that it had a bed assignment for Ms. Stork, and the Hospital arranged transportation. An ambulance arrived to transport Ms. Stork to Duke the next morning at 10:30 a.m.

39. That morning, Dr. Kumar inserted another long note in an attestation of a physician assistant's clinic note, this time the physician assistant's note from the morning of the previous day.

40. Dr. Kumar's note stated that the January 23, 2025, chest x-ray showed "increasing prominence" of the portion of the chest cavity containing the trachea, and that radiology had recommended a CT scan, but that Ms. Stork was "hesitant to have any other surgeries or procedures done." In fact, Ms. Stork relied on Dr. Kumar's recommendation not to have a CT scan.

41. Dr. Kumar's note stated that after the CT results were reviewed with Ms. Stork on January 28, 2025, she declined to be admitted to a hospital to have the fluid drained. In fact, Dr. Kumar never offered that option to Ms. Stork, who relied on Dr. Kumar's recommendation to wait weeks before getting another chest x-ray.

42. Dr. Kumar's note stated that her ER visit on January 30, 2025, was prompted by persistent dry cough, but that Ms. Stork declined admission for drainage. In fact, she was told that

the drainage procedure would not be scheduled any quicker whether she was admitted or went home to await outpatient scheduling.

43. Dr. Kumar's note stated that she first reported that her cough ceased to be dry and became productive only on February 13, 2025, coincidentally the same day the aspiration procedure discovered gas accumulation in her chest. In fact, Ms. Stork complained of a productive cough at an office visit with Dr. Kumar on January 6, 2025. Ms. Stork's daughter was present at that office meeting, and she stated that Ms. Stork's cough was abnormal and sounded wet, almost like drowning. Dr. Kumar then disregarded the complaint, stating that it was normal because "the lung was trying to figure out how to function with a missing lobe."

44. During the February 19 ambulance ride from Charlotte to Durham, Ms. Stork was coughing intensely and coughing up pieces of cartilage—pieces of her trachea.

45. On her admission to Duke, it was noted that Ms. Stork had a "sizable tracheal injury" and given the "extent of tracheal defect" a CT evaluation was needed prior to consideration of a tracheal stent. The CT scan noted again direct fistulous communication between the upper right lung gas field and the trachea. A bronchoscopy was recommended.

46. The bronchoscopy was performed on February 21, 2025. It discovered a large hole on the right aspect of the trachea 1 cm above the carina. The hole was 1 cm wide, with three broken, necrotic tracheal rings hanging within the hole. Below are photographs of the injury taken during bronchoscopy examinations at Duke Medical Center. The carina is the point where the trachea bifurcates into the left and right bronchi, as seen in the first photograph. The jagged hole to the right of the right bronchus in the photograph is the injury. The second photograph shows a closer view of the injury.



**6** Main carina



**3** Trachea

47. The injury photographed above is not an unavoidable complication of a robotic lobectomy, a mediastinal lymph node dissection, or a partial decortication performed with customary technical skill within the standard of care.

48. The injury photographed above is not an injury a thoracic surgeon acting within the standard of care could fail to diagnose or treat over a sixty-day period in which the patient constantly complained of severe and worsening symptoms and had multiple follow up office visits (and an emergency room visit) informed by multiple chest x-rays and CT scans.

49. On February 22, 2025, Dr. Jacob Klapper spoke at length with Ms. Stork and her daughter about Ms. Stork's injuries. He told them that without surgical intervention the tracheal injury would not heal but instead would progress to mediastinal sepsis.

50. The plan of care included a seven ½-hour surgery to repair the hole, which was performed on February 23, 2025, by Dr. Klapper. The surgery went well, and the next morning Ms. Stork was walking hospital halls with a nurse. However, her right lung then collapsed, and she had to be intubated.

51. On February 25, 2025, Dr. Klapper told Ms. Stork's daughter that the collapsed lung prevented the hole from sealing the outside of the trachea, and that he would seal the hole from the inside of the trachea by placing a tracheal stent.

52. The next day, Dr. Klapper placed a tracheal stent in Ms. Stork.

53. On February 28, 2025, a chest x-ray revealed that there was still gas collecting in Ms. Stork's chest despite the surgeries, and she was struggling to breathe. Dr. Klapper confirmed that Ms. Stork still had fluid collecting around her lung.

54. Ms. Stork had previously made a do-not-resuscitate-order and had stated that the stent operation on February 26, 2025, would be the last surgery she had because she could no

-11-

longer tolerate the pain.  The decision was made to cease aggressive interventions and to transfer her to hospice for palliative care.

57. On the evening of February 28, 2025, Ms. Stork's chest tubes were removed.  She was alert and was sitting on the edge of the bed.  Her breathing was "audibly coarse."  When asked if she was in pain, she could only shrug.

56. On March 1, 2025, Ms. Stork was discharged from Duke Medical Center to hospice.  By this point her condition was recorded as "lethargic and nonverbal" and her respirations were labored, rapid, and shallow.  She no longer responded to verbal stimuli.

57. On March 3, 2025, at 6:34 a.m., Ms. Stork passed away.

## CAUSES OF ACTION

### FOR A FIRST CAUSE OF ACTION
### Negligence/Gross Negligence – Wrongful Death

58. The facts and allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

59. Dr. Kumar is a thoracic surgeon, and Ms. Stork was Dr. Kumar's patient.  A physician-patient relationship existed between them.

60. Dr. Kumar owed Ms. Stork, his patient, a duty of care to provide skilled medical and surgical treatment for diseases of her lungs, chest wall, and airways.  This required him to conduct surgical interventions competently and with technical precision.  It also required him to manage post-operative recovery competently, including a duty to diagnose and manage surgical complications in a timely manner to prevent avoidable patient harm.  Dr. Kumar also had a duty of care to honestly and timely disclose any medical or surgical errors, adverse events, test or imaging results, and/or recommendations from other providers.

61. Dr. Kumar breached the duty of care:

-12-

a. by grossly injuring Ms. Stork's trachea during a routine surgical procedure which if performed competently and with customary technical precision would not have resulted in any tracheal injury;

b. by failing to timely diagnose the injury he caused to Ms. Stork's trachea despite having caused it, despite her repeated complaints about abnormal symptoms over an extended period, despite repeated abnormal medical imaging around the injury, despite repeated office visits and examinations of Ms. Stork, and despite repeated concerns expressed by other physicians treating Ms. Stork or interpreting her medical imaging;

c. by substituting his own self-serving speculation about postsurgical packing material in place of professional assessments made by a more competent physician reviewing Ms. Stork's medical imaging and observing fluid collecting near the injury to Ms. Stork's trachea;

d. by failing to schedule an aspiration of fluid around Ms. Stork's lung in a timely manner as urged by physicians at the Novant Health Huntersville Medical Center emergency department;

e. by failing to correctly and honestly report to Ms. Stork the results of medical tests and imaging and recommendations of other providers, so that Ms. Stork could make informed decisions about her medical care;

f. by failing to record Ms. Stork's symptoms correctly and honestly, so that other physicians could make timely, informed decisions about Ms. Stork's medical care; and

g. by such other means as may be adduced through discovery.

62. Dr. Kumar was grossly negligent in that the breaches of the duty of care set forth in Paragraph 61 are a severe deviation from reasonable behavior showing a lack of even slight diligence or care, especially regarding the breach of Dr. Kumar's duty to diagnose and manage surgical complications in a timely manner to prevent avoidable patient harm as set forth in Paragraph 61 subsections (b) through (f).

63. As set forth above, Dr. Kumar's breach of his duty of care directly caused injury to Ms. Stork's trachea and allowed that injury to become fatal.

64. As an actual and proximate result of Dr. Kumar's breach of his duty of care, Ms. Stork suffered extreme pain and suffering, loss of the use of part of her body, and death.

65. Because Dr. Kumar was grossly negligent and Ms. Stork lost the use of part of her body and died as consequence of such gross negligence, the limitations on liability for noneconomic damages in N.C. Gen. Stat. § 90-21.19 do not apply.

66. Defendants Novant Health Medical Group, LLC, and Novant Health, Inc, are liable for Dr. Kumar's actions as set forth in Paragraphs Four through Six.

67. Plaintiff, as personal representative of Ms. Stork's estate, is entitled to recover all damages allowed under N.C. Gen. Stat. § 28A-1-2(b), including expenses for care, pain and suffering suffered by Plaintiff as a result of Ms. Stork's death, Ms. Stork's funeral expenses, and the present monetary value of Ms. Stork's lost income as well as the value of her society, companionship, comfort, guidance, kindly offices, and advice to Plaintiff.

68. Dr. Kumar's actions set forth in Paragraph 61 subsections (c), (e), and (f) were willful or wanton breaches of the duty of care that caused or exacerbated injury to Ms. Stork. Plaintiff therefore is entitled to recover punitive damages from him.

## FOR A SECOND CAUSE OF ACTION
### Negligence/Gross Negligence – Survival

69. The facts and allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

70. Because Dr. Kumar was grossly negligent and Ms. Stork suffered loss of use of part of her body and death, the limitations on liability for noneconomic damages in N.C. Gen. Stat. § 90-21.19 do not apply.

71. Plaintiff, as personal representative of Ms. Stork's estate, is entitled to recover all claims that Ms. Stork could have pursued had she survived, including expenses for medical care, lost income, pain and suffering she endured, and, as to Dr. Kumar, punitive damages.

### JURY DEMAND

Plaintiff respectfully demands trial by jury on all claims so triable.

### PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants in this matter in a sum sufficient to adequately compensate Plaintiff for damages suffered, for punitive damages, for the costs of this action, for her attorneys' fees, and for such other and further relief as the Court may deem just and proper.

[signature block follows]

Respectfully submitted,

s/Andrew R. Hand
Andrew R. Hand (NC Bar No. 46082)
Phillip D. Barber (*pro hac vice forthcoming*)
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street (29201)
Post Office Box 1090
Columbia, SC 29202
(803) 252-4848
arh@harpootlianlaw.com
pdb@harpootianlaw.com

Attorneys for Plaintiff

Columbia, South Carolina
April 6, 2026.